Nathan R. Ring
Nevada State Bar No. 12078
**STRANCH, JENNINGS & GARVEY, PLLC**
3100 W. Charleston Boulevard, Suite 208
Las Vegas, NV 89102
Telephone: (725) 235-9750
nring@stranchlaw.com

Grayson Wells*
John C. Roberts*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Raina C. Borrelli, Esq.*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Phone: (872) 263-1100
Fax: (872) 263-1109
raina@straussborrelli.com

*Pro Hac Vice Forthcoming*

Attorneys for Plaintiff and the Proposed Class

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SCOTT LEVY, on behalf of himself and all others similarly situated, | Case. No.: |
| Plaintiff, | **PROPOSED CLASS ACTION COMPLAINT** |
| v. | |
| BOYD GAMING CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff, Scott Levy ("Plaintiff"), on behalf of himself and all others similarly situated, states as follows for his Class Action Complaint against Defendant Boyd Gaming Corporation ("Boyd" or "Defendant"):

## INTRODUCTION

1.      On September 23, 2025 Boyd reported that it had lost control over its computer network and the highly sensitive personal information stored on the computer network in a data breach ("Data Breach"). On information and belief, the Data Breach has impacted Boyd's current and former employees.

2.      Boyd is a Nevada-based casino entertainment company, owning and operating 28 gaming properties in ten states.[1]

3.      Due to Defendant's intentionally obfuscating language, it is unclear when the Data Breach precisely occurred, how long cybercriminals had unfettered access to Plaintiff's and the Class's highly sensitive information. However, on information and belief, the breach took place prior to September 23, 2025.

4.      Following an investigation into the Data Breach "with leading external cybersecurity experts", Defendant learned cybercriminals gained unauthorized access to current and former employees and customers' personally identifiable information ("PII"), including, on information and belief, their name and Social Security number.

5.      Despite so stating in its FORM 8-K filing with the United States Securities and

---

[1] *Boyd Gaming*, LINKEDIN, https://www.linkedin.com/company/boyd-gaming/about/ (last visited Sept. 25, 2025).

725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

Exchange Commission ("SEC"),[2] Defendant has not notified Plaintiff and Class Members about the Data Breach ("Breach Notice").

6.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering them easy targets for cybercriminals.

7.      Defendant's Breach Notice obfuscated the nature of the breach and the threat it posed—refusing to tell its current and former employees and customers how many people were impacted, how the breach happened, when the breach happened, or why Defendant has failed to notify victims that cybercriminals had gained access to their highly private information.

8.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

9.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

10.     In failing to adequately protect current and former employees and customers' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed a staggering number of employees and customers.

---

[2] Defendant's FORM 8-K filing disclosing the existence of the Data Breach (referred to herein as the "Breach Notice") is attached hereto as **Exhibit A**.

3100 W. Charleston Blvd., #208
Las Vegas, NV 89102
725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY
PLLC
SJG

11.     Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

12.     Plaintiff and the Class are employees and customers of Defendant and are Data Breach victims.

13.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

14.     Plaintiff Scott Levy is a natural person and citizen of Nevada, residing in Las Vegas, Nevada where he intends to remain.

15.     Defendant Boyd Gaming Corporation is a Domestic Corporation with its principal place of business at 6465 S. Rainbow Blvd., Las Vegas, Nevada, 89118.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members and based on Defendant's representations that it operates in ten states, on information and belief, Defendant and at least one member of the putative class are citizens of different states.

17.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in Nevada and regularly conducts business in Nevada.

18.     Venue is proper in this Court under because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs'

claims occurred in this District.

## FACTUAL ALLEGATIONS

*Boyd Gaming Corporation*

19.     Boyd states it is "one of the largest and most successful casino entertainment companies in the United States." [3] Boyd operates 28 gaming properties in ten states – Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Ohio, and Pennsylvania and claims to be a "large, growing, dynamic company."[4]

20.     On information and belief, Boyd has over 10,000 employees[5]

21.     As part of its business, Defendant receives, collects, and maintains the highly sensitive PII of its current and former employees and customers. In doing so, Defendant implicitly promises to safeguard their PII.

22.     After collecting its employees' and customers' PII, Defendant maintains the PII in its computer systems. On information and belief, Defendant maintains former employees' and customers' and PII for years after their relationship is terminated.

23.     In collecting and maintaining employees' and customers' PII, Defendant agreed it would safeguard the data in accordance with its internal policies as well as state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

24.     Indeed, Defendant understood the importance of adequate cybersecurity measures,

---

[3] *About Us*, Boyd, https://www.boydgaming.com/company/about-us (last visited Sept. 25, 2025).

[4] *Id.*

[5] *See* n. 1.

declaring in its Privacy Policy:

    a.  "[w]e are committed to providing security for personal and business information. We use reasonable methods to protect information;" and

    b.  "[w]e will retain your PII for at least as long as needed or permitted for the purpose(s) described in this Privacy Policy and consistent with applicable law."[6]

25.    Defendant understood the need to protect its employees' and customers' PII and prioritize its data security.

26.    Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonably cybersecurity safeguards or policies to protect employees' and customers' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' and customers' PII.

### The Data Breach

27.    Plaintiff is a former employee of Boyd.

28.    As a condition of receiving employment or services from Boyd, employees and customers were required to disclose their PII to Defendant, including but not limited to, their names and Social Security numbers. Defendant used that PII to facilitate its operations and required Plaintiff to provide that PII to obtain employment.

29.    On information and belief, Boyd collects and maintains former and current employees' and customers' unencrypted PII in its computer systems.

---

[6] *Privacy Policy*, BOYD (Mar. 18, 2025), https://www.boydgaming.com/privacy.

3100 W. Charleston Blvd., #208
Las Vegas, NV 89102
725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY
PLLC

30.     In collecting and maintaining the PII, Boyd implicitly agrees it will safeguard the data using reasonable means according to its internal policies and federal law.

31.     According to the Breach Notice, filed with the SEC on September 23, 2025, it "recently experienced a cybersecurity incident in which an unauthorized third party accessed our internal IT system."[7] Due to Defendant's obfuscating information, the precise dates on which the Data Breach occurred and how long cybercriminals had access to Plaintiff's and the Class's most sensitive information is unclear.

32.     Defendant employed "leading external cybersecurity experts" and determined that "the unauthorized third party *removed* certain data from [Defendant's] IT systems, including information about employees and a limited number of other individuals."[8]

33.     Thus, Defendant admitted that PII was actually stolen during the Data Breach, confessing that the information was not just accessed, but was "removed" from Boyd's system.[9]

34.     In other words, the Data Breach investigation revealed Boyd's cyber and data security systems were completely inadequate and allowed cybercriminals to access files containing a treasure trove of its employees' and customers' highly private information.

35.     Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft and sale on the dark web.

36.     On information and belief, Defendant has not yet notified Plaintiff and Class Members about the Data Breach.

---

[7] Ex. A.

[8] *Id*.

[9] *Id*.

37.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

38.     Despite its duties and alleged commitments to safeguard PII, Defendant did not in fact follow industry standard practices in securing employees' and customers' PII, as evidenced by the Data Breach.

39.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

40.     On information and belief, Defendant failed to adequately train and supervise its IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' and customers' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

41.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[10]

---

[10] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

42.     Additionally, Boyd employs intentionally confusing language in its Breach Notice, claiming that its systems were "accessed" and later that an unauthorized party "removed certain data from the Company's IT systems, including information about employees and a limited number of other individuals."[11]

43.     This "disclosure" amounts to no real disclosure at all, as it fails to notify, with any degree of specificity, about of the Data Breach's critical facts.

44.     Despite Defendant's intentional opacity about the root cause of the Data Breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the work of cybercriminals; (2) cybercriminals successfully infiltrated Boyd's network environment; and (3) once inside, cybercriminals targeted highly private information for download and theft.

45.     In the context of data breach notices of this type, Defendant's use of the phrase "access" and "information" is misleading. Organizations only file such notices because they are required by law to do so, and such notices are only produced when a company reasonably believes that sensitive PII, such as Social Security numbers, was stolen by an unauthorized individual.

46.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice***

47.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

48.     In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211%

---

[11] Ex. A.

increase year over year.[12]

49.    In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Boyd knew or should have known that its electronic records would be targeted by cybercriminals.

50.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

51.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

52.    In the years immediately preceding the Data Breach, Defendant knew or should have known that its computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

53.    In November 2023, the Federal Bureau of Investigation issued a Private Industry Notification that, among other things, warned of a trend of "ransomware actors exploiting

---

[12] *2024 Data Breach Report* at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

vulnerabilities in vendor-controlled remote access to casino servers."[13]

54.    This warning followed a series of high-profile ransomware attacks on casino and hotel giants in September 2023.[14]

55.    According to Katell Thielemen, VP analyst at Gartner, casinos "are an opportunistic target because they have money and the public outcry is less pronounced when they are attacked."[15] Plus, "[t]he gaming industry is heavily regulated and therefore is full of technologies to monitor the movement of clients, croupiers, service workers and funds alike. Every one of these systems is a possible entry point."[16]

56.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news

_____

[13] *Private Industry Notification*, FBI, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.aha.org/system/files/media/file/2023/11/bi-tlp-clear-pin-ransomware-actors-continue-to-gain-access-through-third-parties-and-legitimate-system-tools-11-7-23.pdf (last visited September 25, 2025).

[14] Matt Kapko, *Ransomware targeting casinos is on the rise, FBI warns*, CYBERSECURITYDIVE (Nov. 9, 2023), https://www.cybersecuritydive.com/news/ransomware-targets-casinos-fbi/699313/.

[15] *Id.*

[16] *Id.*

for companies as revenge against those who refuse to pay."[17]

57.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[18]

58.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

59.    In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its employees and customers in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII.

60.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and

---

[17] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[18] Stop Ransomware Guide, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited August 30, 2024).

published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

61.    Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' and customers' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

*Plaintiff's Experience and Injuries*

62.    Plaintiff Scott Levy is a former employee of Defendant, having worked for Defendant from April 2022 to May 2024.

63.    Thus, Defendant obtained and maintained Plaintiff's PII. As a result, Plaintiff was injured by Defendant's Data Breach.

64.    As a condition of employment, including for payroll and for participation in Defendant's health plan, Plaintiff provided Defendant with his PII. In doing so, Plaintiff trusted that Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

65.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

66.    On information and belief, Plaintiff's PII has already been published—or will be published imminently—by Interlock or by other cybercriminals on the dark web.

67.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

68.    And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and phishing texts and phone calls. Plaintiff now received 3-4 such texts or phone calls each day.

69.    Once an individual's PII is for sale and access on the dark web, as Plaintiff's is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[19] On information and belief, the spam and phishing calls and texts that Plaintiff is experiencing was made possible as a result of Defendant's Data Breach and the subsequent exposure of Plaintiff's PII to cybercriminals.

70.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

71.    Because of Defendant' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

72.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

73.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant were required to adequately protect.

74.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

75.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of

---

[19] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

time and money to try and mitigate his injuries.

76.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

77.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

78.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class have suffered or are at an increased risk of suffering:

a.  The loss of the opportunity to control how their PII is used;

b.  The diminution in value of their PII;

c.  The compromise and continuing publication of their PII;

d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.  Delay in receipt of tax refund monies;

g.  Unauthorized use of stolen PII; and

h.  The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate

725-235-9750
lasvegas@stranchlaw.com
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102
STRANCH, JENNINGS & GARVEY
PLLC

measures to protect the PII in its possession.

79.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

80.     The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

81.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

82.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

83.     One such example of criminals using PII for profit is the development of "Fullz" packages.

84.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

85.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII

stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

86.    Defendant disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII. Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

87.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

88.    In 2016, the FTC updated its publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

      a.    protect the personal customer information that they keep;

b.   properly dispose of personal information that is no longer needed;

c.   encrypt information stored on computer networks;

d.   understand its network's vulnerabilities; and

e.   implement policies to correct security problems.

89.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

90.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

91.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer, data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

92.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' and customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

93.     Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-

malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

94.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

95.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

96.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

98.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All United States residents whose PII was actually or potentially accessed or acquired in the Data Breach, including all individuals who received notice of the breach.

99.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

100.    Plaintiff reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

101.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least multiple thousands of individuals whose PII was compromised by this Data Breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

102.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

    a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

    b.    Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    c.    Whether Defendant had duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d.  Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e.  Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k.  Whether Defendant violated the consumer protection statutes invoked herein;

l.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

103.  Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

104.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

105.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff have suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

106.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

107.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

108.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

109.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

110.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

111.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

112. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

    b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

    c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

    e. Whether Defendant breached the implied contract;

    f. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

    g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

    i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

# CAUSES OF ACTION

## COUNT ONE
## NEGLIGENCE
### (On behalf of Plaintiff and the Class)

113.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

114.    Defendant solicited, gathered, and stored the PII of Plaintiff and the Class as part of the operation of its business and in order to gain profit.

115.    All Plaintiff and the Class Members entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for employment/business purposes only, and/or not disclose their PII to unauthorized third parties.

116.    Upon accepting and storing the PII of Plaintiff and Class members, Defendant undertook and owed a duty to Plaintiff and Class members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

117.    Defendant had full knowledge of the sensitivity of the PII, the types of harm that Plaintiff and Class members could and would suffer if the PII was wrongfully disclosed, and the importance of adequate security.

118.    Plaintiff and Class members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiff and the Class members had no ability to protect their PII that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiff and the Class.

119.    Defendant was well aware of the fact that cyber criminals routinely target large corporations through cyberattacks in an attempt to steal sensitive personal information.

120.    Defendant owed Plaintiff and the Class members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining,

storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

121.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

122.    Defendant had duties to protect and safeguard the PII of Plaintiff and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive PII. Additional duties that Defendant owed Plaintiff and the Class include:

   a.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiff's and Class members' PII was adequately secured from impermissible release, disclosure, and publication;

   b.    To protect Plaintiff's and Class members' PII in its possession by using reasonable and adequate security procedures and systems;

   c.    To implement processes to quickly detect a data breach, security incident, or intrusion involving its business email system, networks and servers; and

   d.    To promptly notify Plaintiff and Class members of any data breach, security incident, or intrusion that affected or may have affected their PII.

123.    Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the PII that Plaintiff and the Class had entrusted to it.

124.    Defendant breached its duty of care by failing to adequately protect Plaintiff's and Class members' PII. Defendant breached its duties by, among other things:

a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the PII in its possession;

b.    Failing to protect the PII in its possession by using reasonable and adequate security procedures and systems;

c.    Failing to adequately and properly audit, test, and train its employees to avoid phishing emails;

d.    Failing to use adequate email security systems, including industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement to protect against phishing emails;

e.    Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store PII;

f.    Failing to adequately train its employees to not store PII longer than absolutely necessary for the specific purpose that it was sent or received;

g.    Failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class's PII;

h.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

i.    Failing to promptly notify Plaintiff and Class members of the Data Breach that affected their PII.

125.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

126.    As a proximate and foreseeable result of Defendant's grossly negligent conduct,

Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

127.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the PII of Plaintiff and Class members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiff and Class members while it was within Defendant's possession and control.

128.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class members, Defendant prevented Plaintiff and Class members from taking meaningful, proactive steps toward securing their PII and mitigating damages.

129.    As a result of the Data Breach, Plaintiff and Class members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to fraudulent activity, closely monitoring bank account activity, and examining credit reports and statements sent from providers and their insurance companies.

130.    Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

131.    The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

132.    In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

133.    Defendant violated these statutes when it engaged in the actions and omissions

alleged herein, and Plaintiff's and Class members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiff therefore is entitled to the evidentiary presumptions for negligence *per se*.

134.    Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiff and the Class to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiff and the Class.

135.    The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

136.    Defendant gathered and stored the PII of Plaintiff and the Class as part of its business, which affects commerce.

137.    Defendant violated the FTC Act by failing to use reasonable measures to protect the PII of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

138.    Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class members' PII, and by failing to provide prompt and specific notice without reasonable delay.

139.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

140.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

141.    Defendant breached its duties to Plaintiff and the Class under these laws by failing

to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class's PII.

142.    Defendant breached its duties to Plaintiff and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

143.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

144.    The injury and harm that Plaintiff and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence.

145.    Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

146.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

147.    Plaintiff and Class Members were required to provide Defendant with their PII in order to receive employment opportunities and/or recreation/hospitality services.

148.    Plaintiff and Class Members entrusted their PII to Defendant. In doing so, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their PII and to timely notify them in the event of a Data Breach.

149.    A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Defendant with the reasonable understanding that their PII would be adequately protected from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive PII is exchanged as a

condition of receiving services. It is common sense that but for this implicit and/or explicit agreement, Plaintiff and Class Members would not have provided their PII to Defendant.

150.    Based on Defendant's conduct, representations, legal obligations, and acceptance of Plaintiff's and the Class Members' PII, Defendant had an implied duty to safeguard their PII through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its Privacy Policy.

151.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII, including through industry standard technologies like encryption, and failing to provide them with timely and accurate notice of the Data Breach.  Indeed, it took Defendant *weeks* to warn Plaintiff and Class Member of their imminent risk of identity theft. Defendant also failed to notify Plaintiff and the Class Members whether or not their driver's license numbers were compromised, leaving Plaintiff and Class Members unsure as to the extent of the information that was compromised.

152.    As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and the Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiff's and the Class Members' PII.

### COUNT THREE
### UNJUST ENRICHEMNT
### (On behalf of Plaintiff and the Class)

153.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

154.    Plaintiff and the Class bring this claim in the alternative to all other claims and remedies at law.

155.    Those Plaintiff and Class Members who are or were employees of Defendant conferred a monetary benefit upon Defendant in the form of their labor and services. Defendant

understood this benefit. These Plaintiff provided Defendant their labor and PII on the understanding that Defendant would pay the administrative costs of reasonable data privacy and security practices and procedures from the revenue Defendant derived therefrom. In exchange, these Plaintiff should have received adequate protection and data security for such PII held by Defendant.

156.    Those Plaintiff and Class Members who were customers of Defendant conferred a monetary benefit upon Defendant in the form of payment for services. The money paid to Defendant was supposed to be used by Defendant, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

157.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

158.    Defendant collected, maintained, and stored the PII of Plaintiff and Class members as part its business operations and to gain profits. As such, Defendant had direct knowledge of the monetary benefits conferred upon it.

159.    Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with the entities that collected Plaintiff's and the Class members' PII, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiff's and Class members' PII.

160.    Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar PII, Defendant, upon information and belief, instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class members.

161.    Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive PII, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

162.    As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiff and Class members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiff's PII, (ii) time and expenses mitigating harms, (iii) diminished value of PII, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

163.    Defendant, upon information and belief, has therefore engaged in opportunistic and unethical conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class members' interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

164.    Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**COUNT FOUR**
**VIOLATION OF THE NEVADA CONSUMER FRAUD ACT**
**NEV. REV. STAT. § 41.600**
**(On Behalf of Plaintiff and the Class)**

165.    Plaintiff restates and reallege all proceeding factual allegations above as if fully set forth herein.

166.    The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600 states in relevant part: "An action may be brough by any person who is a victim of consumer fraud."

167.    As used in this section, "consumer fraud" means: . . . A deceptive trade practice defined in NRS 598.0915 to 598.0225, inclusive. Nev. Rev. Stat. § 41.600(1) & (2)(e).

168.    In turn, Nev. Rev. Stat. § 598.0923(2) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [f]ails to disclose a material fact in connection with the sale or lease of goods or services." *Id.* Boyd violated this provision because it failed to disclose the material fact that its data security measures were inadequate to reasonably safeguard its employees' and customers' PII. This is true because, among other things, Boyd was aware of the risks of cyberattacks such as the Data Breach. Boyd knew or should have known that that its data security measures were insufficient to guard against attacks such as the Data Breach. Boyd had knowledge of the facts that constituted the omission. Boyd could have and should have made a proper disclosure prior to providing employment to its employees and/or services to customers by any other means reasonably calculated to inform employees or customers of its inadequate data security measures.

169.    Further, Nev. Rev. Stat. § 598.0923(3) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." *Id.* Boyd violated this provision for several reasons, each of which serves as an independent basis for violating Nev. Rev. Stat. § 598.0923(3).

170.    First, Boyd breached its duty under Nev. Rev. Stat. § 603A.210, which requires any data collector "that maintains records which contain personal information" of Nevada residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, . . . use, modification or disclosure." *Id.* Boyd is a "data collector" as defined by Nev. Rev. Stat. § 603A.030. Boyd failed to implement such reasonable security measures, as shown by a system-wide breach of its computer systems during which a threat actor exfiltrated

725-235-9750
lasvegas@stranchlaw.com
SJG
STRANCH, JENNINGS & GARVEY
PLLC
3100 W. Charleston Blvd., #208
Las Vegas, NV 89102

customer PII. Boyd's violation of this statute was done knowingly for the purposes of Nev. Rev. Stat. § 598.0923(3) because Boyd knew or should have known that it would be a target of cyberattacks such as the Data Breach. Boyd knew or should have known that its data security measures were inadequate to protect against cyberattacks such as the Data Breach.

171.    Second, Boyd violated Section 5 of the FTC Act, as alleged above. Boyd knew or should have known that its data security measures were inadequate, violated Section 5 of the FTC Act and failed to adhere to the FTC's data security guidance. This is true because Boyd was well aware that the casino industry is a frequent target of cyberattacks such as the Data Breach and the FTC has recommended various data security measures that companies such as Defendant could have implemented to mitigate the risk of a Data Breach. Boyd chose not to follow such guidance and knew or should have known that its data security measures were inadequate to guard against cyberattacks such as the Data Breach. Boyd had knowledge of the facts that constituted the violation. Boyd's violation of Section 5 of the FTC Act serves as a separate actional basis for purposes of violating Nev. Rev. Stat. § 598.0923(3).

172.    Boyd engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiff and Class Members.

173.    Plaintiff and members of the Class were denied a benefit conferred on them by the Nevada legislature.

174.    As a direct and proximate result of the foregoing, Plaintiff and Class Members have suffered injuries including, but not limited to actual damages, and in being denied a benefit conferred on them by the Nevada legislature.

175.    As a result of these violations, Plaintiff and Class Members are entitled to an award of actual damages, equitable injunctive relief requiring Defendant to implement adequate data security measures, as well as an award of reasonable attorney's fees and costs. Nev. Rev. Stat. §

3100 W. Charleston Blvd., #208
Las Vegas, NV 89102
725-235-9750
lasvegas@stranchlaw.com
STRANCH, JENNINGS & GARVEY
PLLC

41.600(3).

## COUNT FIVE
## DECLARATORY JUDGMENT
### (On behalf of Plaintiffs and the Class)

176.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

177.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary supplemental relief.  The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

178.    In the fallout of the Data Breach, a controversy has arisen about Defendant's duty to use reasonable data security for the PII it collects and maintains from employees and customers.

179.    On information and belief, Defendant's actions were—and *still* are—inadequate and unreasonable.  Plaintiff and Class Members continue to suffer injuries from the ongoing threat of fraud and identity theft due to Defendant's inadequate data security measures.

180.    This Court should enter a judgment declaring as follows:

a.    Defendant owed and continues to owe a legal duty to use reasonable data security to secure the PII entrusted to it;

b.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to protect the PII entrusted to it from unauthorized access, use, and disclosure; and

c.    Defendant's breaches of duties caused and continue to cause injuries to Plaintiff and Class Members.

181.    The Court should also issue injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the PII entrusted to it.

182.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injuries and lack an adequate legal remedy if Defendant experiences a second data breach.  And if a second breach occurs, Plaintiff and Class Members will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct.  Simply put, monetary damages, while warranted for out-of-pocket damages and other legally quantifiable and provable damages, cannot cover the full extent of Plaintiff's and Class Members' injuries.

183.    If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

184.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b.    A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to

conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

iii.    Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

iv.    Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v.    Ordering that Defendant cease transmitting PII via unencrypted email;

vi.    Ordering that Defendant cease storing PII in email accounts;

vii.    Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii.    Ordering that Defendant conduct regular database scanning and securing checks;

ix.    Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x.   Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal information to third parties, as well as the steps they must take to protect against such occurrences;

d.  An order requiring Defendant to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

e.  A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

An award of such other and further relief as this Court may deem just and proper

## JURY DEMAND

Plaintiff hereby demands that this matter be tried before a jury.

Dated: September 25, 2025                    Respectfully Submitted,

*/s/ Nathan R. Ring, Esq.*
Nathan R. Ring
Nevada State Bar No. 12078
**STRANCH, JENNINGS & GARVEY, PLLC**
3100 W. Charleston Boulevard, Suite 208
Las Vegas, NV 89102
Telephone: (725) 235-9750
nring@stranchlaw.com

Grayson Wells*
John C. Roberts*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Raina C. Borrelli, Esq.*

**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Phone: (872) 263-1100
Fax: (872) 263-1109
raina@straussborrelli.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*