Miles N. Clark, Esq.
Nevada Bar No. 13848
**LAW OFFICES OF MILES N. CLARK, LLC**
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
T: (702) 856-7430
miles@milesclarklaw.com
*Proposed Liaison Counsel*

James Pizzirusso*
**HAUSFELD LLP**
1200 17th St NW, Suite 600
Washington, D.C. 20036
T: (202) 540-7154 jpizzirusso@hausfeld.com

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
T: (615) 254-8801
gstranch@stranchlaw.com

*Admitted Pro Hac Vice*

Laura Van Note**
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
T: (510) 891-9800
lvn@colevannote.com

John A. Yanchunis*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: (813) 223-5505
jyanchunis@ForThePeople.com

*Proposed Co-Lead Counsel*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **IN RE: BOYD GAMING CORP. BREACH LITIGATION.**<br><br>This Document Relates to: All Actions | Case No. 2:25-cv-01814-GMN-EJY<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jason Goodman, Trent Berger, Deandric Price Sr., Cosimo Granata, Sherekia Price, Jeri Schmidt, Jacob Malin, and Mark Metzler ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Boyd Gaming Corporation, Defendant Boyd Interactive Gaming, Inc., and

Defendant Boyd Interactive USA, LLC f/k/a Pala Interactive, LLC (together, "Boyd" or "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This class action arises from Defendants' failure to protect highly sensitive data.

2.      Defendants are a gambling conglomerate that operate twenty-eight (28) casinos throughout Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Ohio, and Pennsylvania.[1]

3.      Defendants also operate numerous "online casino brands" and the "Boyd Sports" smartphone application—which enables individuals to gamble "on all your favorite sports with the touch of a finger[.]"[2]

4.      In 2024, Defendants "generated record revenues of over $3.9 billion" and distributed "nearly $750 million in capital to [] shareholders through share repurchases and dividends."[3]

5.      Defendants store a litany of highly sensitive personal identifiable information ("PII") about their current and former customers, employees, and job applicants. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

6.      It is unknown for precisely how long the cybercriminals had access to Defendants' network before the Data Breach was discovered. In other words, Defendants had no effective

---

[1] *About Us*, BOYD GAMING, https://www.boydgaming.com/company/about-us/ (last visited Dec. 3, 2025).

[2] *Home Page*, BOYD SPORTS, https://sports.boydgaming.com/ (last visited Dec. 3, 2025).

[3] *Annual Report 2024*, BOYD GAMING (2024) https://investors.boydgaming.com/download/Boyd+Gaming+2024+Annual+Report+and+10-K.pdf.

means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to the PII of their current and former customers, employees, and job applicants.

7. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

8. Plaintiffs are Data Breach victims and received official data breach notices from Defendants. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

9. The exposure of the private information (of the current and former customers, employees, and job applicants of Defendants) to cybercriminals is a bell that cannot be unrung. Before this data breach, their private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10. Plaintiff, Jason Goodman, is a natural person and a citizen of Nevada. He is domiciled in Nevada (where he intends to remain).

11. Plaintiff, Trent Berger, is a natural person and a citizen of Virginia. He is domiciled in Virginia (where he intends to remain).

12. Plaintiff, Deandric Price Sr., is a natural person and a citizen of Nevada. He is domiciled in Nevada (where he intends to remain).

13. Plaintiff, Cosimo Granata, is a natural person and a citizen of New Jersey. He is domiciled in New Jersey (where he intends to remain).

14. Plaintiff, Sherekia Price, is a natural person and a citizen of Louisiana. She is domiciled in Louisiana (where she intends to remain).

15.    Plaintiff, Jeri Schmidt, is a natural person and a citizen of Minnesota. She is domiciled in Minnesota (where she intends to remain).

16.    Plaintiff, Jacob Malin, is a natural person and a citizen of Illinois. He is domiciled in Illinois (where he intends to remain).

17.    Plaintiff, Mark Metzler, is a natural person and a citizen of Pennsylvania. He is domiciled in Pennsylvania (where he intends to remain).

18.    Defendant, Boyd Gaming Corporation, is a publicly traded corporation incorporated in Nevada and with its principal place of business at 6465 S. Rainbow Boulevard, Las Vegas, Nevada 89118. Boyd Gaming Corporation has no parent company, and no publicly held corporation owns 10 percent or more of the stock of Boyd Gaming Corporation. *See* Dkt. No. 30, at 1.

19.    Defendant, Boyd Interactive Gaming, Inc. is a corporation incorporated in Nevada and with its principal place of business at 6465 S. Rainbow Boulevard, Las Vegas, Nevada 89118. Boyd Interactive Gaming, Inc. is a wholly owned subsidiary of Defendant Boyd Gaming Corporation. *See* Dkt. 30, at 2.

20.    Defendant, Boyd Interactive USA, LLC f/k/a Pala Interactive, LLC, is a limited liability company formed under the laws of Delaware and with its principal place of business at 6465 S. Rainbow Boulevard, Las Vegas, Nevada 89118. Boyd Interactive USA, LLC f/k/a Pala Interactive, LLC is a wholly owned subsidiary of Defendant Boyd Gaming Corporation. *See* Dkt. 30, at 2.

**JURISDICTION AND VENUE**

21.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs Cosimo Granata, Sherekia Price, Jeri Schmidt, and Trent Berger are citizens of different states than Defendants. And there are over 100 putative Class Members.

22.    This Court has personal jurisdiction over Defendants because they are headquartered in Nevada, regularly conduct business in Nevada, and have sufficient minimum contacts in Nevada.

23.    Venue is proper in this Court because Defendants' principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### *Defendants Collected and Stored the PII of Plaintiffs and the Class*

24.    Defendants are a gambling conglomerate that operate twenty-eight (28) casinos throughout Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Ohio, and Pennsylvania.[4]

25.    Defendants also operate numerous "online casino brands" and the "Boyd Sports" smartphone application—which enables individuals to gamble "on all your favorite sports with the touch of a finger[.]"[5]

26.    In 2024, Defendants "generated record revenues of over $3.9 billion" and distributed "nearly $750 million in capital to [] shareholders through share repurchases and dividends."[6]

27.    As part of their business, Defendants receive and maintain the PII of thousands of their current and former customers, employees, and job applicants.

28.    In collecting and maintaining the PII, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

---

[4] *About Us*, BOYD GAMING, https://www.boydgaming.com/company/about-us/ (last visited Dec. 3, 2025).
[5] *Home Page*, BOYD SPORTS, https://sports.boydgaming.com/ (last visited Dec. 3, 2025).
[6] *Annual Report 2024*, BOYD GAMING (2024) https://investors.boydgaming.com/download/Boyd+Gaming+2024+Annual+Report+and+10-K.pdf.

29.     Under state and federal law, businesses like Defendants have duties to protect the PII of their current and former customers, employees, and job applicants and to notify them about breaches.

30.     Defendants recognize these duties, declaring in their "Privacy Policy" that:

a.     "We are committed to providing security for personal and business information."[7]

b.     "We use reasonable methods to protect information."[8]

c.     "In the event we collect sensitive personal information, we collect, use, or disclose it only for purposes permitted under applicable law."[9]

d.     "We will retain your Personal Information for at least as long as needed or permitted for the purpose(s) described in this Privacy Policy and consistent with applicable law."[10]

31.     Notably, in the Privacy Policy, Defendants confirmed that they collect and maintain the following types of PII:

a.     "We may collect the following categories of Personal Information . . . ."[11]

b.     "Identifiers, including name, contact information, social media information, government-issued identifier (social security numbers, driver's license number, license plate number), and contact information including postal address (billing and shipping addresses); email address; telephone number; social media account ID; and Boyd Rewards account number and other loyalty program information."[12]

---

[7] *Privacy Policy*, BOYD GAMING, https://www.boydgaming.com/privacy (last visited Dec. 3, 2025).
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

c.   "Pictures and recordings of you, including profile pictures, and audio, electronic, visual, and similar information."[13]

d.   "Financial information, including credit and debit card numbers and banking and financial account information and commercial information such as transaction information, account use history, and purchase history."[14]

e.   "Biometric data, such as fingerprints, facial recognition, and other information that permits us to identify an individual."[15]

f.   "Precise geolocation information, including precise location based on information from your mobile device, GPS, Wi-Fi, IP address, and other device information, with your consent where required by law and consistent with your mobile device or application permissions."[16]

g.   "Internet or other electronic network activity information, including device ID, internet protocol (IP) address (and your approximate location derived from your IP address), or other unique personal or online identifiers; browser type, referring / exit pages and URLs, other browser history, platform type, clicks, and other traffic data, pages viewed, the amount of time spent on particular pages; and payment events, and related date and time information."[17]

h.   "Some of the categories of information described above may be considered 'sensitive' under applicable law. In the event we collect sensitive personal

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

information, we collect, use, or disclose it only for purposes permitted under applicable law."[18]

32.    Additionally, Defendants have a separate "Jobs Privacy Policy" that applies to "current, former, or potential . . . employees, job applicants, contractors, owners, directors, or officers, including their emergency contacts, dependents, and beneficiaries."[19] Therein, Defendants advertise that:

    a.    "Some of the categories of information described above may be considered 'sensitive' under applicable law. In the event we collect sensitive personal information, we collect, use, retain, or disclose it only for purposes permitted under applicable law."[20]

    b.    "We will not sell the Personal Information, including any sensitive Personal Information, we collect about our employees or applicants for employment or share it with third parties[.]"[21]

    c.    "We will retain your Personal Information for at least as long as needed or permitted for the purpose(s) described in this Jobs Privacy Policy and consistent with applicable law."[22]

    d.    "We are committed to providing security for personal and business information."[23]

    e.    "We use reasonable methods to protect information."[24]

33.    In this Jobs Privacy Policy, Defendants confirmed that they collect and maintain the following types of PII:

---

[18] *Id.*

[19] *Jobs Privacy Policy*, BOYD GAMING, https://www.boydgaming.com/jobs-privacy (last visited Dec. 3, 2025).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

a. "We may collect and retain the following categories of Personal Information . . . name, contact information, online identifiers, IP address, Social Security numbers, and other government-issued ID or numbers, education information, employment history, financial information, work authorization, signature, and medical and medical insurance information . . . sex, age, race, religion, national origin, disability, medical conditions and information, citizenship, immigration status, request for leave, and marital status . . . work history, prior employer, information relating to references, details of qualifications, skills and experience, human resources data, and data necessary for benefits and related administration services[.]"[25]

34. Additionally, in a "Boyd Gaming Team Member Handbook," Defendants acknowledge the importance of "CONFIDENTIALITY" and state that:

a. "Confidential Information is of great commercial value to the Company or third-party business competitors and/or is vital to the Company's security infrastructure."[26]

b. "Team Members are responsible for safeguarding non-public, proprietary company information; . . . personal data of customers such as home and office contact information, social security numbers, driver's license numbers, account numbers, credit card information, and similar data[.]"[27]

35. Separately, Defendants advertise that their "Corporate Governance" includes "Data Security" and that:

---

[25] *Id.*
[26] *Boyd Gaming Team Member Handbook*, BOYD GAMING (2019) https://static.boydgaming.net/boydstyle/assets_v4/thumb/2020-BoydTeamMemberHandbook-ENGLISH.pdf.
[27] *Id.*

a.    "Personal information and data are some of the most important and sensitive assets our guests, team members and business partners have."[28]

b.    "We realize and appreciate the trust our stakeholders place in us when they provide us with this information, and we have invested in comprehensive measures to keep that information safe and secure."[29]

c.    "Led by Boyd Gaming's Chief Information Security Officer (CISO) and a dedicated Information Security team, Boyd operates and maintains a comprehensive program designed to safeguard our systems, services, and data from cybersecurity-related threats."[30]

d.    "Our CISO and Senior Vice President of Legal Operations and Compliance provide diligent oversight of our data privacy and cybersecurity programs."[31]

e.    "Our Board of Directors and Information Security Advisory Board, consisting of cross-functional leaders within the organization, receive briefings from the CISO at every Board meeting."[32]

f.    "These briefings cover risks to the business, our security posture, and progress on our cybersecurity initiatives."[33]

g.    "We regularly engage third parties to assess our overall cybersecurity posture, our data security programs, and risks to the business."[34]

h.    "We conduct regular penetration tests of our systems."[35]

---

[28]  *Data Security*, BOYD GAMING, https://www.boydgaming.com/company/corporate-social-responsibility/corporate-governance/data-security (last visited Dec. 3, 2025).
[29]  *Id.*
[30]  *Id.*
[31]  *Id.*
[32]  *Id.*
[33]  *Id.*
[34]  *Id.*
[35]  *Id.*

i.    "We also regularly review our source code to identify and address potential cybersecurity risks."[36]

j.    "We hold unannounced, regular cybersecurity exercises with every Boyd Gaming team member with email access."[37]

k.    "These exercises include email 'phishing' simulations that evaluate team members' correct use of reporting tools."[38]

l.    "Compliance rates for these exercises are tracked by department, with follow-up training provided to individual team members as necessary."[39]

m.    "We advise our team members on the need for vigilance when receiving phone calls from unknown persons claiming to be Boyd team members and demanding network access."[40]

n.    "We have a comprehensive Incident Response Plan (IRP) that covers all Boyd operations in the United States and Canada."[41]

o.    "We review and rehearse this plan with periodic tabletop exercises and make annual updates as necessary."[42]

p.    "We have a Security Operations Center (SOC) in operation 24/7 that utilizes leading security technologies and automated processes to protect our network, systems, and databases."[43]

q.    "These technologies are designed to protect, detect and immediately respond to unauthorized attempts to access our network and systems."[44]

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

r.    "All team members with network access participate in mandatory training sessions to review current cybersecurity threats and best practices."[45]

s.    "Monthly information security newsletters are distributed to all Boyd team members with email access, touching on important cybersecurity issues and recognizing team members who report suspicious activity to the Cyber Defense team."[46]

t.    "These communications are augmented by ad-hoc advisories on current and emerging cyberthreats."[47]

36.    Similarly, in its 2024 Annual Report to shareholders, Defendants advertised that:

a.    "Cybersecurity represents a critical component of the Company's overall approach to risk management."[48]

b.    "We deploy systems safeguards that are designed to protect our information systems from cybersecurity threats, including firewalls, intrusion prevention and detection systems, anti-malware functionality and access controls, which are evaluated and improved through ongoing vulnerability assessments and cybersecurity threat intelligence."[49]

c.    "Our Board oversees the management of risks from cybersecurity threats, including the policies, standards, processes and practices that management implements to address risks from cybersecurity threats."[50]

d.    "Our Board receives regular presentations and reports on cybersecurity risks, which address a wide range of topics including, for example, recent developments, evolving standards, vulnerability assessments, third-party

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

and independent reviews, the threat environment, technological trends and information security considerations arising with respect to our peers and third parties."[51]

    e.    "Our Board also receives prompt and timely information regarding any cybersecurity incident that meets established reporting thresholds, as well as ongoing updates regarding such incident until it has been addressed."[52]

***Defendants' Data Breach***

37.    On September 5, 2025, Defendants were hacked in the Data Breach.[53]

38.    Worryingly, Defendants already admitted that:

    a.    "[O]n September 6, 2025, Boyd became aware of a cyber incident that involved the unauthorized removal of information from a system used to store data."[54]

    b.    "Boyd determined that the unauthorized activity began on September 5, 2025 and the last observed unauthorized activity occurred on September 7, 2025."[55]

    c.    "Based on the analysis to date, Boyd has determined that the unauthorized actor ***removed personal information***[.]"[56]

39.    In a separate filing with the U.S. Securities and Exchange Commission ("SEC"), Defendants confirmed that "an unauthorized third party accessed our internal IT system" and that

---

[51] *Id.*

[52] *Id.*

[53] *Data Breach Notification*, Iowa Atty Gen (Oct. 2, 2025) https://www.iowaattorneygeneral.gov/media/cms/1022025__Boyd_Gaming_Corporation_EB2F E46064B35.pdf.

[54] *Id.*

[55] *Id.*

[56] *Id.* (emphasis added).

"the unauthorized third party removed certain data from the Company's IT systems, including information about employees and a limited number of other individuals."[57]

40.    Because of Defendants' Data Breach, at least the following types of PII were removed by cybercriminals:

        a.    names;

        b.    addresses;

        c.    dates of birth;

        d.    driver's license information;

        e.    Social Security numbers;

        f.    passport numbers;

        g.    state ID numbers; and

        h.    "other government-issued identification information[.]"[58]

41.    Notably, Defendants equivocate regarding the scope of PII exposed—stating that "[b]ased on our analysis *to date*, we have determined that the information about you that was involved in this incident included your name . . ."[59] Thus, on information and belief, the Data Breach exposed a broader range of PII for all Plaintiffs and Class Members than those listed *supra*.

42.    Thus, Plaintiffs seek injunctive relief requiring Defendants to complete their "analysis" of the Data Breach and then provide Plaintiffs and Class Members with updated notice detailing the full extent of their exposure (e.g., what types of PII were exposed).

---

[57]    *Boyd Gaming Corporation*, SEC (Sept. 23, 2025) https://www.sec.gov/Archives/edgar/data/906553/000119312525213546/d20726d8k.htm.

[58]    *Id.*; *see also Data Security Breach Reports*, TEXAS ATTY GEN, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Dec. 3, 2025) (stating that the types of PII exposed included "Name of individual; Address; Social Security Number Information; Driver's License number; Government-issued ID number (e.g. passport, state ID card); Date of Birth").

[59]    *Notice of Data Breach*, MAINE ATTY GEN (Sept. 24, 2025) https://ago.vermont.gov/sites/ago/files/documents/2025-10-02%20Boyd%20Gaming%20Corporation%20Data%20Breach%20Notice%20to%20Consumers.pdf (emphasis added).

43.    In a disclosure to the Indiana Attorney General, Defendants indicated that the Data Breach injured 11,000 persons—via the exposure of their PII—in the Data Breach.[60] Upon information and belief, these 11,000 persons include their current and former customers, employees, and job applicants (i.e., the "Class" or "Class Members").

44.    On information and belief, the Data Breach impacted a far greater number of individuals than 11,000. After all, in a disclosure to the Iowa Attorney General, Defendants indicated that there are 4,000 Class Members in Iowa alone.[61] And in a disclosure to the Texas Attorney General, Defendants indicated that there are 4,300 Class Members in Texas alone.[62]

45.    And yet, Defendants waited until September 24, 2025, before they began notifying the class.[63] Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

46.    These delays and likely inaccuracies in Defendants' notifications likely mean Defendants failed in the most administrative cybersecurity safeguard—a reasonable and tested incident response plan. These plans are the cornerstone of any reasonable cybersecurity program and are specifically designed to ensure that incident responses are handled efficiently and effectively and in accordance with a company's obligations under the various data breach notification statutes to timely and accurately provide notice of the breach to affected individuals.

---

[60] *Data Breach Report*, INDIANA ATTY GEN, https://www.in.gov/attorneygeneral/consumer-protection-division/id-theft-prevention/files/DB-Year-to-Date-Report-12_25.pdf (last visited Dec. 3, 2025).

[61] *Data Breach Notification*, IOWA ATTY GEN (Oct. 2, 2025) https://www.iowaattorneygeneral.gov/media/cms/1022025__Boyd_Gaming_Corporation_EB2F E46064B35.pdf.

[62] *Data Security Breach Reports*, TEXAS ATTY GEN, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Dec. 3, 2025).

[63] *Data Breach Notification*, IOWA ATTY GEN (Oct. 2, 2025) https://www.iowaattorneygeneral.gov/media/cms/1022025__Boyd_Gaming_Corporation_EB2F E46064B35.pdf.

47.    And when Defendants did notify Plaintiffs and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

    a.    "[W]e are providing you with the enclosed information about steps that you can take to protect against potential misuse of personal information."[64]

    b.    "[R]emain vigilant for incidents of fraud and identity theft, including by regularly reviewing your account statements and monitoring free credit reports."[65]

    c.    "If you discover any suspicious or unusual activity on your accounts or suspect identity theft or fraud, be sure to report it immediately to your financial institutions."[66]

    d.    "In addition, you may contact the Federal Trade Commission ('FTC') or law enforcement, including your state Attorney General, to report incidents of identity theft or to learn about steps you can take to protect yourself from identity theft."[67]

    e.    "To learn more, you can go to the FTC's website, at www.ftc.gov/idtheft/, or call the FTC, at (877) IDTHEFT (438-4338) or write to Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580."[68]

    f.    "If you identify information on your credit report resulting from a fraudulent transaction, you should request that the credit-reporting agency delete that information from your credit report file."[69]

---

[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*

g.    "You can add a fraud alert to your credit report file to help protect your credit information."[70]

48.    Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

49.    Since the Data Breach, Defendants claim that "[w]e continue to invest in additional security enhancements designed to mitigate against future risk."[71]

50.    But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII will be protected from additional exposure in a subsequent data breach.

51.    Defendants have done little to remedy their Data Breach. True, Defendants have offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendants inflicted upon them.

52.    Because of Defendants' Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

53.    Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully "removed" data.

54.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have

---

[70] *Id.*
[71] *Id.*

gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[72]

55.    Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff Trent Berger's Experiences and Injuries***

56.    Plaintiff Trent Berger is a former customer of Defendants.

57.    Thus, Defendants obtained and maintained Plaintiff's PII.

58.    As a result, Plaintiff was injured by Defendants' Data Breach.

59.    Plaintiff received a formal Data Breach notice letter from Boyd Gaming dated September 24, 2025.

60.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

61.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

62.    Plaintiff provided Defendants with his PII including, but not limited to, his name, driver's license information, Social Security number, PayPal information, Venmo information, and banking information (including his checking account information).

63.    Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

64.    Through their Data Breach, Defendants compromised Plaintiff's PII.

65.    Plaintiff ***already suffered*** from rampant identity theft and fraud:

---

[72] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, Harvard Bus. Rev. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

a.  On September 29, 2025, Plaintiff received a warning from his credit monitoring service "CreditWise" that his PII was found published on the Dark Web.

b.  On October 5, 2025, cybercriminals attempted to withdraw money from his cryptocurrency account (he was notified that a "withdrawal" was delayed).

c.  On October 9, 2025, cybercriminals from Moscow, Russia, attempted to log into his cryptocurrency account.

d.  On October 13, 2025, Plaintiff received another warning from CreditWise that his PII was found published on the Dark Web.

e.  On October 15, 2025, Plaintiff received another warning from CreditWise that his PII was found published on the Dark Web.

f.  On October 16, 2025, Plaintiff received two (2) warnings from CreditWise that his PII was found published on the Dark Web.

g.  In or around November 2025, cybercriminals placed a fraudulent charge on his payment card for approximately $300 at an REI store.

66.  Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

67.  In total, Plaintiff lost approximately three and a half (3.5) hours attempting to mitigate the fallout of the Data Breach—including, *inter alia*, researching the Data Breach, monitoring his various accounts, reviewing Dark Web notifications, reviewing credit reports, and changing passwords.

68.  And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails.

69.  Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

70.     Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

71.     Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

72.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

73.     As a former customer, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced their prices to account for the deficient data security.

74.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

75.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

76.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Deandric Price's Experiences and Injuries***

77.     Plaintiff Deandric Price Sr. is a former employee and customer of Defendants.

78.     Thus, Defendants obtained and maintained Plaintiff's PII.

79.     As a result, Plaintiff was injured by Defendants' Data Breach.

80.     Plaintiff received a formal Data Breach notice letter from Boyd Gaming on or around September 2025.

81.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

82.     Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

83.     Plaintiff provided Defendants with his PII including, but not limited to, his financial history, 401k information, life insurance information, birthdate, identification information, banking account information, full name, and Social Security number.

84.     Plaintiff reasonably understood that a portion of the funds paid to Defendants and/or derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

85.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

86.     Through their Data Breach, Defendants compromised Plaintiff's PII.

87.     Plaintiff *already suffered* from rampant identity theft and fraud—whereby, since September 2025:

        a.     identity thieves opened a fraudulent credit card using his identity and placed approximately $5,000 in fraudulent charges;

        b.     identity thieves used his identity and bank account to pay for various subscription services for approximately $50 and approximately $109 (these costs were charged to Plaintiff's bank account);

c.    Plaintiff was notified of a credit inquiry for a car loan (which suggests that identity thieves applied for a fraudulent car loan using his identity); and

d.    Capital One has repeatedly notified Plaintiff about a loan application that he never applied for.

88.    Since the Data Breach, Plaintiff incurred out-of-pocket financial losses for hiring a credit monitoring company to analyze his credit report and purchasing a TransUnion account. In total, Plaintiff has paid approximately $15 per month for at least two months. Additionally, Plaintiff incurred out-of-pocket financial losses for the fraudulent subscriptions that identity thieves charged to his bank account (*see supra*).

89.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that his PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

90.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

91.    In total, Plaintiff lost approximately thirty (30) hours attempting to mitigate the fallout of the Data Breach—including, *inter alia*, researching the Data Breach, reviewing his various accounts, researching credit monitoring options, reviewing his emails for suspicious activity, and attempting to address the rampant identity theft and fraud (*see supra*).

92.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails.

93.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

94.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

95.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

96.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

97.    As a former customer, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced their prices to account for the deficient data security.

98.    As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided his labor to Defendants in exchange for both payment and reasonable data security for his PII. After all, if Plaintiff had known about Defendants' deficient data security practices, then Plaintiff would have either (1) not worked for Defendants at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[73]

99.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

---

[73] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. (MIT PRESS) 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LABOR REL. REV. (CORNELL UNIV.) 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith Right After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. (UNIV. CHICAGO PRESS) 336, 336–37 (1983).

100.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

101.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Cosimo Granata's Experiences and Injuries***

102.    Plaintiff Cosimo Granata is a former customer of Defendants.

103.    Thus, Defendants obtained and maintained Plaintiff's PII.

104.    As a result, Plaintiff was injured by Defendants' Data Breach.

105.    Plaintiff received a formal Data Breach notice letter from Pala Interactive dated September 24, 2025.

106.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

107.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

108.    Pursuant to his customer relationship, Plaintiff provided Defendants with his PII, including but not limited to, his name, email address, date of birth, and Social Security number.

109.    Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

110.    Through their Data Breach, Defendants compromised Plaintiff's PII.

111.    Plaintiff ***already suffered*** from identity theft and fraud—whereby on or around September 27, 2025, cybercriminals placed unauthorized charges on his Wells Fargo Visa cash card. As a result, Plaintiff was forced to close his card and open a new card. After the cancelation

of his old card, and before receiving the new card, Plaintiff was deprived of the full use of his Wells Fargo account.

112.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that his PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

113.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

114.    In total, Plaintiff lost approximately ten (10) hours attempting to mitigate the fallout of the Data Breach—including, *inter alia*, researching the Data Breach, signing up for credit monitoring, and reviewing his financial accounts.

115.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails and phone calls.

116.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

117.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

118.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

119.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

120.    As a former customer, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if

-25-
CONSOLIDATED CLASS ACTION COMPLAINT

Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced their prices to account for the deficient data security.

121.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

122.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

123.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Sherekia Price's Experiences and Injuries***

124.     Plaintiff Sherekia Price is a former job applicant for Boyd Gaming.

125.     Thus, Defendants obtained and maintained Plaintiff's PII.

126.     As a result, Plaintiff was injured by Defendants' Data Breach.

127.     Plaintiff received a formal Data Breach notice letter from Boyd Gaming dated September 24, 2025.

128.     Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

129.     Plaintiff provided her PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

130.    Pursuant to her employment application, Plaintiff provided Defendants with her PII, including but not limited to, her name, Social Security number, date of birth, and government identification card information.

131.    Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

132.    Through their Data Breach, Defendants compromised Plaintiff's PII.

133.    Plaintiff *already suffered* from identity theft and fraud—whereby, since September 2025, she received numerous warnings from Credit Karma about suspicious activity regarding her credit and financial accounts.

134.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that her PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

135.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

136.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

137.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

138.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

139.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

140.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

141.     Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Jeri Schmidt's Experiences and Injuries***

142.     Plaintiff Jeri Schmidt is a former employee and current customer of Defendants.

143.     Thus, Defendants obtained and maintained Plaintiff's PII.

144.     As a result, Plaintiff was injured by Defendants' Data Breach.

145.     Plaintiff received a formal Data Breach notice letter from Boyd Gaming dated September 24, 2025.

146.     Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

147.     Plaintiff provided her PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

148.     Pursuant to her employment and customer relationship, Plaintiff provided Defendants with her PII including but not limited to her: name, Social Security number, financial account information, date of birth, email address, and driver's license information.

149.     Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

150.     Through their Data Breach, Defendants compromised Plaintiff's PII.

151.     Plaintiff ***already suffered*** from identity theft and fraud:

a.      In late September 2025, Plaintiff received a letter notifying her that she was registered for Medicaid benefits. However, Plaintiff has never registered for

Medicaid. In other words, cybercriminals used her identity to commit welfare fraud.

    b.    On October 16, 2025, Plaintiff was notified by U.S. Bank that cybercriminals added her identity to a J.P. Morgan Chase Bank credit card with a $2,500 credit limit. Plaintiff did not authorize or recognize the credit card. In the fallout of such identity theft, her credit score dropped by approximately forty (40) points. Thus far, Plaintiff has been unable to rectify such identity theft.

152.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that her PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

153.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

154.    In total, Plaintiff lost approximately forty (40) hours attempting to mitigate the fallout of the Data Breach—including, *inter alia*, researching the Data Breach, monitoring her financial accounts for fraud, and physically travelling to a U.S. Bank office to discuss the fraudulent activity on her account.

155.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

156.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

157.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

158.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

159.    As a current customer, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced their prices to account for the deficient data security.

160.    As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided her labor to Defendants in exchange for both payment and reasonable data security for her PII. After all, if Plaintiff had known about Defendants' deficient data security practices, then Plaintiff would have either (1) not worked for Defendants at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[74]

161.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

162.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

---

[74] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. (MIT PRESS) 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LABOR REL. REV. (CORNELL UNIV.) 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith Right After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. (UNIV. CHICAGO PRESS) 336, 336–37 (1983).

163.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Mark Metzler's Experiences and Injuries***

164.    Plaintiff Mark Metzler is a former customer of Defendants.

165.    Thus, Defendants obtained and maintained Plaintiff's PII.

166.    As a result, Plaintiff was injured by Defendants' Data Breach.

167.    Plaintiff received a formal Data Breach notice letter from Pala Interactive dated September 24, 2025.

168.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

169.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

170.    Pursuant to his customer relationship, Plaintiff provided Defendants with his PII, including but not limited to, his name, date of birth, Social Security number, driver's license information, and bank account information.

171.    Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

172.    Through their Data Breach, Defendants compromised Plaintiff's PII.

173.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that his PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

174.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

175.    In total, Plaintiff lost approximately ten (10) hours attempting to mitigate the fallout of the Data Breach—including, *inter alia*, reviewing his bank account, changing passwords, checking his credit score, and setting up two-factor authentication.

176.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam texts and phone calls.

177.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

178.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

179.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

180.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

181.    As a former customer, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced their prices to account for the deficient data security.

182.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

183.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

184.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Jacob Malin's Experiences and Injuries***

185.    Plaintiff Jacob Malin is a former employee of Boyd Gaming.

186.    Thus, Defendants obtained and maintained Plaintiff's PII.

187.    As a result, Plaintiff was injured by Defendants' Data Breach.

188.    Plaintiff received a formal Data Breach notice letter from Boyd Gaming dated September 24, 2025.

189.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

190.    As a condition of his employment with Defendants, Plaintiff provided Defendants with his PII. Defendants used that PII to facilitate their employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

191.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

192.    Pursuant to his employment, Plaintiff provided Defendants with his PII including, but not limited to, his name, date of birth, Social Security number, email address, address, previous

employer history, and financial account information (including the direct deposit information for his checking account).

193.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

194.    Through their Data Breach, Defendants compromised Plaintiff's PII.

195.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that his PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

196.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

197.    In total, Plaintiff spends approximately one (1) hour per week reviewing his credit report, ten (10) minutes per day reviewing his financial account, and ten (10) minutes per day reviewing any spam and scams received.

198.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam texts and phone calls (approximately 3–5 per day).

199.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

200.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

201.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

202.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

203.    As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided his labor to Defendants in exchange for both payment and reasonable data security for his PII. After all, if Plaintiff had known about Defendants' deficient data security practices, then Plaintiff would have either (1) not worked for Defendants at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[75]

204.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

205.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

206.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Jason Goodman's Experiences and Injuries***

207.    Plaintiff Jason Goodman is a former employee of Boyd Gaming.

208.    Thus, Defendants obtained and maintained Plaintiff's PII.

209.    As a result, Plaintiff was injured by Defendants' Data Breach.

210.    Plaintiff received a formal Data Breach notice letter from Defendants dated September 24, 2025.

---

[75] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. (MIT PRESS) 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LABOR REL. REV. (CORNELL UNIV.) 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith Right After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. (UNIV. CHICAGO PRESS) 336, 336–37 (1983).

211.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

212.    As a condition of his employment with Defendants, Plaintiff provided Defendants with his PII. Defendants used that PII to facilitate their employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

213.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

214.    Pursuant to his employment, Plaintiff provided Defendants with his PII including, but not limited to, his name, date of birth, Social Security number, financial account information, and contact information.

215.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

216.    Through their Data Breach, Defendants compromised Plaintiff's PII.

217.    Plaintiff *already suffered* from identity theft and fraud—whereby, since September 2025, Plaintiff noticed suspicious activity on his PayPal account including fraudulent charges for $351, $1100, and $899. Additionally, Plaintiff learned that his PII was found published on the Dark Web (including, at least, his phone number and email address).

218.    Given the severity of the Data Breach—and the fact that many Plaintiffs already suffered from fraud and identity theft—Plaintiff alleges, on information and belief, that his PII has already been published (or will be published imminently) by cybercriminals on the Dark Web.

219.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in the formal Data Breach notice.

220.    In total, Plaintiff spends approximately six (6) hours per week attempting to mitigate the fallout of the Data Breach—including, *inter alia*, reviewing his bank accounts for fraud, researching the Data Breach, monitoring his credit score.

221.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam phone calls (approximately 6–7 per day).

222.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

223.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

224.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

225.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

226.    As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided his labor to Defendants in exchange for both payment and reasonable data security for his PII. After all, if Plaintiff had known about Defendants' deficient data security practices, then Plaintiff would have either (1) not worked for Defendants at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[76]

---

[76] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. (MIT PRESS) 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LABOR REL. REV. (CORNELL UNIV.) 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith*

227. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

228. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

229. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

230. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[77] Therein, Cisco reported the following:

    a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[78]

    b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[79]

    c.    89% of consumers stated that "I care about data privacy."[80]

---

*Right After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. (UNIV. CHICAGO PRESS) 336, 336–37 (1983).

[77] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

[78] *Id.* at 3.

[79] *Id.*

[80] *Id.* at 9.

d.     83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[81]

e.     51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[82]

f.     75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[83]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

231.     Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.     loss of the opportunity to control how their PII is used;

b.     diminution in value of their PII;

c.     compromise and continuing publication of their PII;

d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f.     delay in receipt of tax refund monies;

g.     unauthorized use of their stolen PII; and

h.     continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

---

[81] *Id*.
[82] *Id*.
[83] *Id*. at 11.

*Substantially Increased Risk of Identity Theft and Fraud*

232.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

233.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

234.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

235.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

236.    The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[84] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[85] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

237.    The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed

---

[84] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[85] *Id*.

PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII.

238.    Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

239.    In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

240.    For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[86] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[87]

241.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[86] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[87] *Id.*

242.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[88]

243.    It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

244.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

245.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

246.    Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even

---

[88] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

CONSOLIDATED CLASS ACTION COMPLAINT

give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[89]

247.    One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[90] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

248.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a

---

[89] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[90] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/    medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

249.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[91]

250.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendants failed to rapidly report to Plaintiffs and the Class that their PII was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

251.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

252.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

253.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

---

[91] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

254. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

255. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[92]

256. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[93]

257. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Could Have Prevented the Data Breach***

258. Data breaches are preventable.[94] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

    a.    "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[95]

    b.    "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[96]

---

[92] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[93] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[94] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[95] *Id.* at 17.

[96] *Id.* at 28.

c.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [97]

***Defendants Failed to Follow FTC Guidelines***

259.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

260.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[98] The FTC declared that, *inter alia*, businesses must:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

261.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

262.    Furthermore, the FTC explains that companies must:

a.    not maintain information longer than is needed to authorize a transaction;

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

---

[97] *Id.*

[98] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

263.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

264.    Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to the data of Plaintiffs and Class Members constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

265.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

266.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

267.    Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01,

PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

268.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

269.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following nationwide class:

> **Nationwide Class**: All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Defendants in September 2025, including all those individuals who received notice of the breach.

270.    Plaintiffs also propose the following subclasses:

> **Illinois Subclass**: All individuals residing in Illinois whose PII was compromised in the Data Breach discovered by Defendants in September 2025, including all those individuals who received notice of the breach. The proposed representative for the Illinois Subclass is Plaintiff Jacob Malin.

> **Minnesota Subclass**: All individuals residing in Minnesota whose PII was compromised in the Data Breach discovered by Defendants in September 2025, including all those individuals who received notice of the breach. The proposed representative for the Minnesota Subclass is Plaintiff Jeri Schmidt.

> **Pennsylvania Subclass**: All individuals residing in Pennsylvania whose PII was compromised in the Data Breach discovered by Defendants in September 2025, including all those individuals who received notice of the breach. The proposed representative for the Pennsylvania Subclass is Plaintiff Mark Metzler.

> **Virginia Subclass**: All individuals residing in Virginia whose PII was compromised in the Data Breach discovered by Defendants in September 2025, including all those individuals who received notice of the breach. The proposed representative for the Virginia Subclass is Plaintiff Trent Berger.

271.    Together, the Nationwide Class, Illinois Subclass, Minnesota Subclass, Pennsylvania Subclass, and Virginia Subclass are referred to as the "Class."

272.    Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

273.    Plaintiffs reserve the right to amend the class definition.

274.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

275.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

276.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 11,000 members.

277.    <u>Typicality</u>. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

278.    <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

279.    <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a.    if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendants were negligent in maintaining, protecting, and securing PII;

d.    if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII;

e.    if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendants' Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiffs and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

280.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

# FIRST CAUSE OF ACTION
## Negligence
### (On Behalf of Plaintiffs and the Class)

281.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

282.    Plaintiffs and the Class entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

283.    Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

284.    Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

285.    Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' PII.

286.    Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the PII in their care and custody;

    b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c.    promptly detect attempts at unauthorized access;

    d.    notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

287.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required

and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

288.   Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

289.   Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

290.   Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

291.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

292.   PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

293.   Defendants improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

294.   Defendants breached these duties as evidenced by the Data Breach.

295.   Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a.   disclosing and providing access to this information to third parties and

b.     failing to properly supervise both the way the PII was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

296.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

297.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

298.    Defendants have admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

299.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

300.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

301.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### SECOND CAUSE OF ACTION
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

302.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

303.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII, as the Section 5 of the FTC Act, along with the FTC's cybersecurity guidance and the many consent orders it has issued following enforcement actions, provide a clearly defined standard of care.

304.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII.

305.    Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

306.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

307.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

308.    Defendants also committed negligence *per se* by violating, *inter alia*, Nev. Rev. Stat. § 41.600; Nev. Rev. Stat. § 598.0923(1)(b); Nev. Rev. Stat. § 598.0923(1)(c); Nev. Rev. Stat.

§ 603A.210(1); Nev. Rev. Stat. § 603A.220(1); 815 ILCS 505/1, *et seq*.; 815 ILCS 505/2; 815 Ill. Comp. Stat. 530/1, *et seq*.; Minn. Stat. § 325F.68; 73 Pa. Cons. stat. §§ 201-2 *et seq*.; Va. Code Ann. §§ 59.1-196, *et seq*.; and Va. Code Ann. § 18.2-186.6(B) (as discussed *infra*).

309.    But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

310.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

311.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

312.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

313.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

314.    Plaintiffs and Class Members were required to provide their PII to Defendants as a condition of receiving services and/or employment provided by Defendant. Plaintiffs and Class Members provided their PII to Defendants or their third-party agents in exchange for Defendants' services and/or employment.

315.    Plaintiffs and Class Members reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

316.    Plaintiffs and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

317.     Plaintiffs and the Class Members accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for services and/or employment.

318.     In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

319.     In their Privacy Policies, Defendants represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

320.     Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

321.     After all, Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of such an agreement with Defendant.

322.     Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

323.     The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

324.     Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

325.     Defendants materially breached the contracts it entered with Plaintiffs and Class Members by:

      a.     failing to safeguard their information;

      b.     failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c.    failing to comply with industry standards;

d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

326.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

327.    Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

328.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

329.    Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy—Intrusion Upon Seclusion and Public Disclosure of Private Facts**
**(On Behalf of Plaintiffs and the Class)**

330.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

331.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

332.    Defendants owed a duty to their current and former customers, employees, and job applicants, including Plaintiffs and the Class, to keep this information confidential.

333.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII is highly offensive to a reasonable person.

334.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected

from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

335. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

336. Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

337. Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

338. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

339. Moreover, Defendant's actions constitute intent under Section 8A of the Restatement (Second) of Torts, which defines intent to include situations, as here, in which the tortfeasor was substantially certain that its conduct would lead to the consequences alleged. Indeed, given the ubiquity of data breaches, Defendants must have been substantially certain that its decision to forgo the appropriate investments in cybersecurity would lead to a data breach.

340. In addition, Defendant's conduct represents a public disclosure of private information in that the disclosure was made to the precise group of people for whom Defendant's cybersecurity measures were supposed to protect Plaintiffs and the proposed Class—cybercriminals bent on stealing sensitive information for misuse.

341. As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

342. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

343.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

344.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiffs and the Class.

345.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

346.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

347.    This claim is pleaded in the alternative to the breach of implied contract claim.

348.    Plaintiffs and Class Members conferred a benefit upon Defendants. After all, Defendants benefitted from (1) using their PII to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit.

349.    Defendants appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

350.    Plaintiffs and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

351.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

352.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

353.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) employment and/or payment because Defendants failed to adequately protect their PII.

354.    In the alternative, Plaintiffs lack adequate legal remedies because (1) Defendants still retain their PII without using reasonable data security; (2) Plaintiffs are seeking injunctive relief requiring Defendants to improve their data security and also to provide complete and updated notice to all Plaintiffs and Class Members about the full scope of the Data Breach and the types of PII exposed; and (3) the PII retained by Defendants has independent monetary value.

355.    Thus, Plaintiffs seek restitution, disgorgement, and also injunctive relief. Moreover, injunctive relief is necessary because if the Court does not enter an injunction and a second breach occurs, then Plaintiffs will lack an adequate remedy at law because the resulting injuries are not readily quantified in full.

356.    Simply put, monetary damages, while warranted for out-of-pocket damages and other legally quantifiable and provable damages, cannot cover the full extent of Plaintiffs' and Class Members' injuries. In other words, Plaintiffs do not suffer from a purely monetary injury, nor are they requesting the same sum in both restitution and monetary damages from the same harm.

357.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**SIXTH CAUSE OF ACTION**
**Violation of the Nevada Consumer Fraud Act**
**Nev. Rev. Stat. § 41.600**
**(On Behalf of Plaintiffs and the Class)**

358.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

359.    NRS § 41.600 provides that "[a]n action may be brought by any person who is a victim of consumer fraud."

360.    Defendants violated NRS § 41.600 and committed a deceptive trade practice under NRS § 598.0923(1)(b) and NRS § 598.0923(1)(c) by *inter alia*:

   a.    knowingly failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' PII, which was a direct and proximate cause of the Data Breach;

   b.    knowingly failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c.    knowingly failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and other state data security statutes, which was a direct and proximate cause of the Data Breach;

   d.    knowingly omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII; and

   e.    knowingly omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

361.    Additionally, Defendants violated NRS § 603A.210(1) which mandates that "[a] data collector that maintains records which contain personal information of a resident of this State shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure."

362.    Additionally, Defendants violated NRS § 603A.220(1) which mandates that "[a]ny data collector that maintains computerized data which includes personal information that the data collector does not own shall notify the owner or licensee of the information of any breach of the security of the system data immediately following discovery if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person."

363.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

364.    Defendants intended to mislead Plaintiffs and Class Members and induce them to rely on their omissions.

365.    Had Defendants disclosed to Plaintiffs and Class Members that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiffs and Class Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

366.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class Members' rights.

367.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for

fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

368.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

369.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law.

**SEVENTH CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.***
**(On Behalf of Plaintiff Jacob Malin and the Illinois Subclass)**

370.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

371.    This claim is brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

372.    Plaintiff and Illinois Subclass Members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

373.    Plaintiff, the Class, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

374.    The ICFA applies to Defendants because Defendants engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

375.    Defendants violated the ICFA by, *inter alia*:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Illinois Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and

-63-
CONSOLIDATED CLASS ACTION COMPLAINT

privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass Members' PII, including duties imposed by FTC Act, 15 U.S.C. § 45 and other state data security statutes, which was a direct and proximate cause of the Data Breach;

d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Illinois Subclass Members' PII; and

e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

376.    Defendants also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Illinois Subclass of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act ("IPIPA"), 815 Ill. Comp. Stat. 530/1, *et seq*.,

377.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

378.    Defendants intended to mislead Plaintiff and Illinois Subclass Members and induce them to rely on their omissions.

379.    Had Defendants disclosed to Plaintiff and Illinois Subclass Members that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Illinois Subclass Members

entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Illinois Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

380.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Illinois Subclass Members' rights.

381.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

382.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

383.    Plaintiff and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law.

384.    Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Illinois Subclass. Plaintiff and the Illinois Subclass have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

385.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the ICFA.

## EIGHTH CAUSE OF ACTION
### Violation of Minnesota Consumer Fraud Act
### Minn. Stat. § 325F.68, *et seq*.
### (On Behalf of Plaintiff Schmidt and the Minnesota Subclass)

386.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

387.    Defendants, Plaintiff, and Minnesota Subclass Members are all "person[s]" under Minn. Stat. § 325F.68(3).

388.    Defendants engaged in "sales" under Minn. Stat. § 325F.68(4).

389.    Defendants violated Minn. Stat. § 325F.69(1) by, *inter alia*:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Minnesota Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Minnesota Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes which was a direct and proximate cause of the Data Breach;

d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Minnesota Subclass Members' PII; and

e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Minnesota Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

390.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

391.    Defendants intended to mislead Plaintiff and Minnesota Subclass Members and induce them to rely on their omissions.

392.    Had Defendants disclosed to Plaintiff and Minnesota Subclass Members that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Minnesota Subclass Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Minnesota Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

393.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Minnesota Subclass Members' rights.

394.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Minnesota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

395.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

396.    Plaintiff and Minnesota Subclass Members seek all monetary and non-monetary relief allowed by law.

### NINTH CAUSE OF ACTION
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 Pa. Cons. stat. §§ 201-2 *et seq.***
**(On Behalf of Plaintiff Metzler and the Pennsylvania Subclass)**

397.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

398.    Defendants, Plaintiff, and Pennsylvania Subclass Members are all "Person[s]" under 73 Pa. Cons. stat. § 201-2(2).

399.    Defendants engaged in "Trade" or "commerce" under 73 Pa. Cons. stat. § 201-2(3).

400.    Defendants violated 73 Pa. Cons. stat. §§ 201-2 and 201-3 by, *inter alia*:

   a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Pennsylvania Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

   b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes which was a direct and proximate cause of the Data Breach;

   d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Pennsylvania Subclass Members' PII; and

   e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

401.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

402.    Defendants intended to mislead Plaintiff and Pennsylvania Subclass Members and induce them to rely on their omissions.

403.    Had Defendants disclosed to Plaintiff and Pennsylvania Subclass Members that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Pennsylvania Subclass Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Pennsylvania Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

404.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Pennsylvania Subclass Members' rights.

405.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

406.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

407.    Plaintiff and Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law.

## TENTH CAUSE OF ACTION
### Violation of Virginia Consumer Protection Act
### Va. Code Ann. §§ 59.1-196, *et seq.*
### (On Behalf of Plaintiff Trent Berger and the Virginia Subclass)

408.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

409.    Virginia Personal Information Breach Notification Act

410.    Defendants are each a "person" and a "supplier" that engaged in "[c]onsumer transaction[s]" under Va. Code Ann. § 59.1-198.

411.    Va. Code Ann. § 59.1-200 prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction[.]"

412.    Defendants violated Va. Code Ann. §§ 59.1-200 by, *inter alia*:

    a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Virginia Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes which was a direct and proximate cause of the Data Breach;

    d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Virginia Subclass Members' PII; and

    e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and other state data security statutes.

413.    Defendants also violated Va. Code Ann. § 18.2-186.6(B) which mandates that entities "shall disclose any breach of the security of the system following discovery or notification

of the breach of the security of the system to . . . any affected resident of the Commonwealth without unreasonable delay."

414.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

415.    Defendants intended to mislead Plaintiff and Virginia Subclass Members and induce them to rely on their omissions.

416.    Had Defendants disclosed to Plaintiff and Virginia Subclass Members that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Virginia Subclass Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Virginia Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

417.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Virginia Subclass Members' rights.

418.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Virginia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

419.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

420.    Plaintiff and Virginia Subclass Members seek all monetary and non-monetary relief allowed by law.

**ELEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

421.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

422.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

423.    In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

424.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.    Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.    Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

      d.    Defendants breaches of their duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

425.    The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

426.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

427.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

428.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

429.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Enjoining Defendants from further unfair and/or deceptive practices;

E.    Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.      Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.      Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Date: December 5, 2025

Respectfully submitted,

/s/*Miles N. Clark*
Miles N. Clark, Esq.
Nevada Bar No. 13848
**LAW OFFICES OF MILES N. CLARK, LLC**
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
T: (702) 856-7430
miles@milesclarklaw.com
*Proposed Liaison Counsel*

James Pizzirusso*
**HAUSFELD LLP**
1200 17th St NW, Suite 600
Washington, D.C. 20036
T: (202) 540-7154 jpizzirusso@hausfeld.com

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
T: (615) 254-8801
gstranch@stranchlaw.com

John A. Yanchunis*
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor

Tampa, Florida 33602
T: (813) 223-5505
jyanchunis@ForThePeople.com


Laura Van Note*
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
T: (510) 891-9800
lvn@colevannote.com

*Proposed Co-Lead Counsel*

Raina C. Borrelli*
**STRAUSS BORRELLI, PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Tel: (872) 263-1100
raina@straussborrelli.com


David Hilton Wise
Nevada State Bar No. 11014
**WISE LAW FIRM, PLC**
335 W 1st Street
Reno, Nevada 89503
Tel: (775) 299-4284
dwise@wiselaw.pro


Daniel Srourian*
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr., Suite 200
Beverly Hills, CA 90210
Tel: (213) 474-3800
daniel@slfla.com


M. Anderson Berry*
Gregory Haroutunian*
**EMERY REDDY, P.C.**
600 Stewart St., Suite 1100
Seattle, WA 98101
Tel: (206) 442-9106
anderson@emeryreddy.com
gregory@emeryreddy.com

Ken Grunfeld*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
grunfeld@kolawyers.com

John J. Nelson*
Gary Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

Terence R. Coates
Dylan J. Gould
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Tel: (513) 651-3700
tcoates@msdlegal.com
dgould@msdlegal.com

Leigh S. Montgomery*
**EKSM, LLP**
4200 Montrose Street, Suite 200
Houston, Texas 77006
Tel: (888) 350-3931
lmontgomery@eksm.com

Lynn A. Toops*
Amina A. Thomas*
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenmalad.com
athomas@cohenandmalad.com

*Additional Plaintiffs' Counsel*

*Admitted Pro Hac Vice